FILED IN CLERK'S OFFICE
U S D C   Atlanta

JUN 2 4 2008

JAMES N. HATTEN, Clerk
By_____
Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| VERONZA L. BOWERS, JR., | No. 1 08-CV-2095 |
| Petitioner, | PETITION FOR A WRIT OF |
| v. | HABEAS CORPUS PURSUANT |
| LOREN GRAYER, WARDEN, | TO 28 U.S.C. § 2241 |
| Respondent. | |

Veronza L. Bowers, Jr. brings this Petition for a Writ of Habeas Corpus,

pursuant to 28 U.S.C. § 2241, to obtain his release from unlawful federal custody.

### PRELIMINARY STATEMENT

1.     Veronza L. Bowers, Jr. is a federal prisoner who has served over

thirty-four years of a federal life sentence.  Under 18 U.S.C. § 4206(d), he should

have been released on mandatory parole on April 6, 2004.  However, contrary to

that statute, the United States Parole Commission ("Commission") failed to

consider Mr. Bowers for release.  On October 26, 2004, the U.S. District Court for

the Middle District of Florida ordered the Commission to review Mr. Bowers for

mandatory parole immediately and conduct any necessary hearing within sixty

days.  Instead of deciding the matter promptly, the Commission held a series of

proceedings that lasted a year.  Five different hearing examiners looked at the case,

and each examiner recommended that Mr. Bowers be paroled.  Based upon the

examiners' findings and recommendations, the Commission twice ordered Mr.

Bowers to be released on mandatory parole, but then twice rescinded its own

orders as Mr. Bowers was about to be freed.  In the last instance, the full

Commission granted parole, but that decision was reversed after the unprecedented

and unauthorized intervention of then-Attorney General Alberto Gonzales.

  2. The Attorney General personally intervened after he was implored to

do so by Deborah A. Spagnoli, a member of the Commission who had

unsuccessfully attempted to block Mr. Bowers' mandatory parole.  She covertly

sent a memorandum to the Attorney General setting forth her views and advising

him that trying to overturn the parole grant would curry political favor with the law

enforcement community.  In her secret memorandum, she also informed the

Attorney General that she would participate in the Commission's consideration of

any appeal he might file.  Neither Commissioner Spagnoli nor the Department of

Justice disclosed her memorandum to the other Commissioners—much less to Mr.

Bowers or his attorneys.  Instead, it was kept secret until September 2007, almost

two years after the Commission's proceedings were completed.

3. Eight days after receiving Commissioner Spagnoli's communication, the Attorney General intervened and personally requested that the Commission consider the case again and "render a new decision." Exhibit 54.

4. As set forth in the accompanying Memorandum of Law and supporting Exhibits, the Attorney General was not authorized by either the Parole Act or the Commission's regulations to seek further review of a case that had already been decided by the full Commission. Nevertheless, the members of the Commission—including Commissioner Spagnoli—immediately voted to reopen Mr. Bowers' case.

5. Since there was no authority for the Attorney General's extraordinary request, there were also no rules for handling it. With the assistance of the Attorney General's office, the Commission crafted an ad hoc set of procedures for Mr. Bowers' case only.

6. On October 6, 2005, the full Commission held a closed-door meeting to consider the Attorney General's request for reconsideration. The Commission's staff presented only the case for denying mandatory parole, ignoring entirely the findings of the examiners who had heard Mr. Bowers and their written reports explaining the basis on which they recommended that Mr. Bowers was entitled to a mandatory parole. The Commission members, disregarding their own previous

decisions as well as findings made by their own hearing examiners, denied Mr.

Bowers parole.  No explanation was provided for this switch in position; no new

evidence was adduced which might have warranted the Commission's

reconsideration of its actions, nor did the Commission explain the basis for its

apparent new interpretation of the Parole Act —an interpretation inconsistent with

its prior and subsequent mandatory parole decisions.

7.     Mr. Bowers remains in custody.

## PARTIES

8.     Petitioner Veronza L. Bowers, Jr. is incarcerated at the United States

Penitentiary, 601 McDonough Blvd., S.E., Atlanta, Georgia 30315, under Bureau

of Prisons Register No. 35316-136.

9.     Respondent Loren Grayer is the Warden of the United States

Penitentiary, 601 McDonough Blvd., S.E., Atlanta, Georgia 30315.  As Warden,

Respondent Grayer has custody of Mr. Bowers.

## FACTS ABOUT THE U.S. PAROLE COMMISSION

### A.    The Congress, the Attorney General, and the Six Lives of the Parole Commission

10.    In 1976, Congress passed the Parole Commission and Reorganization Act ("Parole Act"),[1] to "provide[] *an infusion of due process* in Federal parole procedures."[2]  Congress characterized the parole system "as the single most inequitable, potentially capricious, and uniquely arbitrary corner of the criminal justice map."[3]

11.    Under the Parole Act, the new Parole Commission would have nine members: a chair, three National Commissioners who would sit on the National Appeals Board, and five Regional Commissioners who would make first-level parole decisions in their geographic regions.  *See* 18 U.S.C. §§ 4202, 4204(a)(5).[4] The Commission was to be "an independent agency in the Department of Justice." 18 U.S.C. § 4202.  However, the Attorney General was given certain limited

---

[1] Pub. L. No. 94-233, 90 Stat. 219 (1976), now codified (as amended) at 18 U.S.C. §§ 4201-4218.

[2] H.R. Rep. 94-184, 94th Cong. 1st Sess. 2 (1975) (emphasis added).

[3] *Id.*

[4] Congress eventually set the number of Commissioners at five. *See* National Capital Revitalization and Self-Government Improvement Act of 1997, § 11231(d), Pub. L. No. 105-33, 111 Stat. 745-46 (1997).

powers with respect to the administration of the Commission, such as designating members of the Commission to serve as National or Regional Commissioners.[5]

12.     Eight years later, Congress passed the Sentencing Reform Act of 1984, abolishing parole for individuals convicted on or after November 1, 1987, the effective date of the federal sentencing guidelines.[6]  "Old law" inmates, those incarcerated for offenses that took place prior to November 1, 1987, remain under subject to the Parole Act.[7]  As part of the same legislation, Congress determined that the Commission should be abolished.  It was originally scheduled to go out of business on November 1, 1992.  In 1990, Congress extended the life of the Commission for five more years, or until 1997, and since then has acted three other times, most recently to keep the Commission functioning until October 2008.[8]

---

[5] *See* Executive Order No. 11919, June 9, 1976, 41 F.R. 23663.

[6] Pub. L. 98-473, Title II, c. II, 98 Stat. 1837, 2031 (1984).

[7] *See id.*, § 235.

[8] *See* Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 316, 104 Stat. 5089, 5115 (extension from 1992 to 1997); Parole Commission Phaseout Act of 1996, Pub. L. No. 104-232, § 2(a), 110 Stat. 3055 (extension from 1997 to 2002); 21st Century Department of Justice Appropriations Authorization Act, Pub L. No. 107-273, § 11017(a), 116 Stat. 1758, 1824 (extension from 2002 to 2005); United States Parole Commission Extension and Sentencing Commission Authority Act of 2005, Pub. L. No. 109-76, § 2, 119 Stat. 2035 (extension from 2005 to 2008).

13.     The latest legislation extending the life of the Commission was before

Congress from June through September 2005,[9] while the Attorney General's

intervention in this matter was before the Commission.  Under the 1996 Act, the

Attorney General has been required to report to Congress on whether it would be

more cost effective to keep the Commission or to transfer its functions elsewhere.

According to the Commission's official history, the Attorney General has reported

each year that "it is more cost effective for the Parole Commission to continue as a

separate agency."[10]   The Commission thus lives on in large part by the grace of the

Attorney General.

**B.     Discretionary and Mandatory Parole**

14.     Under the Parole Act, an "old law" inmate with a life sentence, such

as Mr. Bowers, is eligible for release on "discretionary parole" after serving ten

years. *See* 18 U.S.C. § 4205(a).  In deciding whether to grant discretionary parole,

the Commission is required to apply its guidelines, as well as consider the "nature

and circumstances of the offense and the history and characteristics of the

---

[9] S.1368 was introduced and passed by the Senate on July 1, 2005.  It passed the House on September 21, 2005, and was signed by the President on September 29, 2005.

[10] *See* Parole Act, § 3, 110 Stat. 3056 (instructing the Attorney General to report to Congress on the status of the Commission, and certify whether the continuation of the Commission is the most effective and cost-effective manner to carry out its functions; the Attorney General may also submit a plan to transfer the Commission's functions to another entity); *see also* History of The Federal Parole System, p. 2, found at www.usdoj.gov/uspc/history.htm.

prisoner" and determine whether release would "depreciate the seriousness of his

offense or promote disrespect for the law" or "jeopardize the public welfare."  18

U.S.C. § 4206(a).  If an inmate is not released following an initial hearing,

subsequent proceedings (commonly called "statutory interim hearings") are held

every two years thereafter.  *See* 18 U.S.C. § 4208(h)(2); 28 C.F.R. § 2.14.[11]

      15.    After a person has served two-thirds of a sentence or thirty years of a

life sentence, the calculus shifts to favor the grant of parole.  The Parole Act

requires release on "mandatory parole" unless the Commission makes specific

affirmative findings to overcome a statutory presumption of release.  Congress also

changed the focus of the parole inquiry from the nature and seriousness of the

offense to whether the inmate has obeyed prison rules and will obey the law on

release.  The Act provides:

> Any prisoner . . . who is not earlier released . . . *shall be*
> *released on parole* after having served two-thirds of each
> consecutive term or terms or *after serving thirty years of*
> *each consecutive term* or terms of more than forty-five
> years *including any life term*, whichever is earlier.
> *Provided however*, That the Commission shall not release
> such prisoner if it determines that he has seriously or
> frequently violated institution rules and regulations or

---

[11]  Unless otherwise indicated, all citations to the Commission's regulations are to
those in effect in 2004 and 2005.

that there is a reasonable probability that he will commit
any Federal, State or local crime.[12]

## C.    The Commission's Decision-Making Process

16.     Parole Commissioners do not conduct parole hearings. Rather, the

power to conduct hearings is delegated to hearing examiners. A single examiner

typically presides at a parole hearing, prepares a summary of his or her findings,

and makes a recommendation. That recommendation is then reviewed by a second

examiner, and a third, if necessary. The recommendation of the examiner panel

goes to a single Regional Commissioner. See 28 C.F.R. §§ 2.13(a), 2.23(b). At

that point, there are two different decisional paths that may be taken.

17.     On the path followed in the overwhelming number of cases, the

Regional Commissioner concurs with the panel, and the recommendation then

becomes the decision of the Commission. See 28 C.F.R. §§ 2.23(d), 2.24(a). Once

this decision is made by the Regional Commissioner, the inmate or the Attorney

General may appeal to the Commission's appellate body, the National Appeals

Board. See 18 U.S.C. § 4215; 28 C.F.R. §§ 2 26(a), (f). Because the Commission

has been reduced in size,[13] all members of the Commission now sit on the National

---

[12] 18 U.S.C. § 4206(d)(emphasis added).

[13] At the time of Mr. Bowers' mandatory parole hearing and related review, there
were five Commissioners. Now there are four. Commissioner Spagnoli left the
agency in May 2007. President Bush has submitted a replacement for
Commissioner Spagnoli to the Senate, but that nomination remains pending. See

Appeals Board. *See* 28 C.F.R. § 2.26(b)(2). The Commission's regulations list the seven permissible grounds for appeal. *See* 28 C.F.R. § 2.26(e).

18.    On the other decisional path, the reviewing Regional Commissioner may choose to designate the case as an "original jurisdiction" matter, which means that the case will be decided by the full Commission. *See* 28 C.F.R. §§ 2.17(a), 2.24(b). A case is designated for original jurisdiction only if the Regional Commissioner handling the matter so designates it.[14] An inmate who receives an unfavorable ruling may appeal, but because it goes back to the same group of decision-makers such an appeal is now called a "petition for reconsideration." *See* 28 C.F.R. § 2.26(a)(1). There are no corollary provisions authorizing the Attorney General to seek further review of an original jurisdiction decision.

---

Office of the President, Press Release, President Busch Announces Four Nominations, dated Jan. 10, 2008.

[14] *See* 28 C.F.R. § 2.17(a); U.S. Parole Commission, Rules and Procedures Manual (hereafter, "USPC Manual"), § 2.17-02(b) (2003). The Commission's August 2003 Rules and Procedures Manual contains the agency's rules and interpretations that were in effect in 2004 and 2005, when the events that are the subject of this petition took place. The USPC Manual is available at: http://www.usdoj.gov/uspc/rules_procedures/uspcmanual8-15-03final.pdf.

## STATEMENT OF FACTS

### A.   Mr. Bowers' Conviction

19.    Mr. Bowers, a 62 year-old inmate, has been incarcerated for more

than thirty-four years under a life sentence for a crime committed on August 5,

1973.  As the court of appeals explained in affirming Mr. Bowers' conviction:

> [Mr. Bowers] was convicted of murdering Kenneth C.
> Patrick, [a] park ranger employed by the United States
> Park Service. . . The park ranger's body was found
> beside Mount Vision Road in Point Reyes National
> Seashore.  He had been shot three times …. Evidence
> developed in subsequent investigation indicated that
> [Mr.] Bowers, Alan Veale, and Jonathan Shoher had been
> stopped by the park ranger while on an expedition to
> poach deer, and [Mr.] Bowers had shot the ranger.  [Mr.
> Bowers] and Alan Veale were indicted for murder.  The
> cases were [severed] for trial, [Mr.] Bower's trial to lead.
> Veale elected to testify against [Mr. Bowers].  After [Mr.
> Bower's] conviction, the indictment against Veale was
> dismissed.[15]

20.    Mr. Bowers was twenty-seven at the time of his arrest and had no

prior criminal record.  He pled not guilty.  Though this petition concerns only Mr.

Bowers' subsequent treatment by the Parole Commission—and not the validity of

the underlying conviction—he has steadfastly maintained his innocence and has

consistently asserted that his co-defendant and another key government witness

testified falsely to receive favorable deals from the prosecution.  Mr. Bowers was

---

[15] *United States v  Bowers*, 534 F.2d 186, 187-188 (9th Cir. 1976).

also a member of the Black Panther Party from 1968 until 1971. In this context

and due to his prior association with the Black Panther Party, Mr. Bowers has

referred to himself as a "political prisoner."

## B.   Mr. Bowers' Prison Record

21.    For the past twenty years, Mr. Bowers has maintained an unblemished

prison record  As a hearing examiner recently explained, Mr. Bowers "has not had

a disciplinary report since 1988 and has not been a management problem for prison

staff." Exhibit 26 at 2.[16] The same hearing examiner also characterized Mr.

Bowers as "an outstanding inmate and an asset to the operation of the prison."

Exhibit 28 at 3.

22.    When he first arrived at federal prison, Mr. Bowers was "bitter."[17] A

difficult initial adjustment period culminated in a 1979 attempt to escape for which

Mr. Bowers was convicted and sentenced to a consecutive six months in prison.

*See* Exhibit 41 at 2. Since his escape attempt, Mr. Bowers has matured

considerably and got past his bitterness.[18] In 1981, just two years after his escape

attempt, Mr. Bowers assisted prison staff by convincing an angry inmate with a

---

[16] References to "Exhibits" are to the Exhibits supporting the accompanying
Memorandum of Law.

[17] *See* Exhibit 1 at 3; Exhibit 2 at 3; Exhibit 7 at 1.

[18] *See* Exhibit1 at 3; Exhibit 2 at 3; Exhibit 7 at 1.

knife to release the weapon.[19] Mr. Bowers' unit manager later noted that he was commended for his actions which "saved staff from assault and possible homicide." Exhibit 2 at 2. Former Parole Commissioner Getty also acknowledged that Mr. Bowers' efforts in this matter were "life-saving." Exhibit 4 at 1.

23.    Since the initial adjustment period, Mr. Bowers has used his time in prison in an exceptionally productive fashion, devoid of any bitterness or hostility. Mr. Bowers has "consistently received excellent work reports" and has "accomplished numerous important programs."[20] He has helped to develop prison programs and has mentored other inmates.[21] Mr. Bowers has earned an Associate's Degree and has taken other college courses.[22] His vocational efforts have also been remarkable; Mr. Bowers has acquired an extraordinary set of skills, becoming expert in, among other things, meditation, yoga, the Japanese shakuhachi flute, sign language, and baking.[23] Based on this record, a panel of parole examiners found in 1993 that Mr. Bowers' institutional behavior had "steadily improved" and that he was a "different person" than during his "early years of incarceration." Exhibit 7 at 2. Case Manager Cheryl Jiminez called Mr.

---

[19] *See* Exhibit 1 at 3; Exhibit 2 at 2; Exhibit 7 at 3.

[20] Exhibit 28 at 3; Exhibit 12 at 1.

[21] *See* Exhibit 26 at 2; Exhibit 28 at 3; Exhibit 14 at 27-28.

[22] *See* Exhibit 26 at 2; Exhibit 28 at 3.

[23] *See* Exhibit 1 at 3; Exhibit 7 at 1; Exhibit 5 at 2-3; Exhibit 12 at 1.

Bowers as a "positive role model." Exhibit 14 at 31-34.  The chaplain at FCI Coleman said that Mr. Bowers was "an instrumental part of the Religious Service programs" and that he has "the most positive attitude that could be imagined." Exhibit 21.

24.    Prison staff—who have the unique opportunity to watch Mr. Bowers every day in a close and pressure-filled environment—emphasize that he would perform well on parole.  Case Manager Oakes recently stated that Mr. Bowers' "performance in prison has been excellent" and that she had not seen "one example of anything that could be used in a negative way."  Exhibit 28 at 3.  As far back as 1991, Unit Manager King "personally endorse[d]" Mr. Bowers for release since he was a "productive person" who had a "positive and mature interaction with staff." Exhibit 2 at 2.  In 2000, Unit Manager Bryant called Mr. Bowers an "outstanding person."  Exhibit 15 at 2.    Although Mr. Bryant had "never" spoken on behalf of an inmate at a parole hearing, he "didn't hesitate a second" to speak in support of Mr. Bowers.  Exhibit 14 at 28.  Unit Manager Bryant praised Mr. Bowers for his decades of good conduct, explaining "how difficult it is to be incident free" for many years while incarcerated.  Exhibit 15 at 2.  He noted that incident reports are "very easy" to get and that Mr. Bowers has "set the standard" for his good conduct. Exhibit 14 at 27.

**C.    Mr. Bowers' Requests for Discretionary Parole**

25.    After Mr. Bowers served ten years of his sentence, he became legally

eligible for release on discretionary parole.[24] While the various Parole

Commission decision-makers found Mr. Bowers to be a very good parole risk

based on his positive institutional adjustment,[25] they generally determined that the

seriousness of the underlying crime and reasons of accountability required that he

remain in custody until his mandatory parole date.  For example, the National

Appeals Board stated in 1991 that "the fact that you are a very good parole risk

---

[24]  In addition to the habeas corpus petition filed to secure his mandatory parole hearing, *see* p. 1, *supra,* Mr. Bowers filed two habeas corpus petitions with respect to discretionary parole.

In the first petition, he challenged the Commission's consideration of a false and unsupported allegation that he had been involved in a violent act while in prison.  The government conceded (and the U.S. Court of Appeals agreed) that the use of this allegation violated the Due Process Clause and the Court ordered the Commission to consider Mr. Bowers for parole without this allegation. *Bowers v United States Parole Comm'n*, 1993 U.S. App. LEXIS 17097 (9th Cir. 1993); Exhibit 6 (related court order).

The second petition, *Veronza Bowers v. U.S. Parole Commission*, Case No. 5:01-cv-429-Oc-10GRJ (M.D. Fla.) (filed December 31, 2001; decided July 28, 2003), challenged the Commission's decisions to deny discretionary parole.  Under the deferential standard of review that applies to the Commission's discretionary parole decisions, the Court denied relief.  Exhibit 19 at 9.

[25] The Commission uses its own objective criteria to determine an inmate's "salient factor score" (on a scale of 1 to 10) as an indicator of parole prognosis.  Mr. Bowers routinely achieved a score of 10, *see* Exhibits 9, 16, which is the rating for "very good" parole prognosis.  USPC Manual at 28, 58-71.  Hearing examiners— who had the opportunity to meet Mr. Bowers personally and speak with prison staff—also made clinical judgments about him.  Tellingly, in the last three discretionary parole hearings, the examiners concluded that Mr. Bowers was: "not . . . a more serious risk" than indicated by his ("very good") salient factor score, Exhibit 10 at 5 (1995 hearing); "a very good parole risk," Exhibit 12 at 2 (1998 hearing); and "no longer a serious risk based on his continued positive institutional adjustment over the past 20 years as well as his program participation," Exhibit 15 at 2 (2000 hearing).

does not alleviate the need for accountability for your criminal acts." Exhibit 3. A

July 1993 hearing panel explicitly found that "though subject has made an

outstanding institutional adjustment. . . the panel still feels that the crime is so

serious that the subject should not be paroled prior to his two-thirds date which is

at 30 years." Exhibit 5 at 3.[26]

26.     One event that occurred during the discretionary parole process is

critically important to the current petition. On June 9, 1993, Ranger Patrick's

widow, Tomie Patrick Lee, told the Commission that she had received a letter from

Mr. Bowers in 1990. Commissioner John Simpson specifically discussed this

letter in a 1993 memorandum to the National Commissioners when he voted to

deny discretionary parole. *See* Exhibit 8. Concerned about its effect on his parole,

Mr. Bowers raised this issue at his 1995 hearing, explaining that he did write a

letter to Mrs. Lee in 1990, but only because he had received a certified receipt form

indicating that someone had mailed a letter to her in his name. He wrote the 1990

letter to inform Mrs. Lee that he had not written any previous letter to her. The

return receipt form had been attached to a letter sent to Mrs. Lee by the Bureau of

---

[26] *See also* Exhibit 17.

Prisons' Victim Witness Coordinator and the return receipt was mistakenly given to Mr. Bowers.[27] *See* Exhibit 10 at 3.

27.    During the 1995 parole hearing, the hearing examiner, Samuel Robertson, read the letter to Mrs. Lee and expressly "found that it appeared to be the type of letter that the inmate represented it to be in that it was an explanation of the circumstances regarding his receipt of a notice that a letter had been sent to her under his name." *Id.* Moreover, "[t]his examiner did not find this letter to be threatening or intimidating in any manner." *Id.* He concluded that the letter did not provide "any basis for the denial of parole." *Id.* at 5.

28.    Following that hearing, Regional Commissioner Simpson once again voted to deny discretionary parole, but this time did so based on the facts of the offense, without regard to the letter. *See* Exhibit 11 at 1-2. The issue was thus put to rest until the proceedings which form the basis of this petition. As hearing examiner Stephen Husk wrote in preparation for Mr. Bowers' 2000 parole hearing: "It appears that the [C]ommission did determine that this letter was not meant in a

---

[27] Mr. Bowers was not faulted by the Bureau of Prisons which conducted a full investigation of the matter but issued no citation or misconduct report whatsoever. *See* Exhibit 67 at 4 (stating that "Bowers's 1990 letter to the widow of Ranger Patrick was not found to constitute a violation of institution rules and regulations").

threatening manner and it did not factor in the [C]ommission's decisions to continue this individual to the expiration of this term." Exhibit 13 at 2.

**D.    Mr. Bowers' Initial Request for Release on Mandatory Parole**

29.    Because Mr. Bowers served thirty years of his life sentence (plus four months of his consecutive six-month sentence for attempted escape), the Commission was required under 18 U.S.C. § 4206(d) to parole Mr. Bowers unless it found that he was guilty of "serious or frequent infractions" while in prison or that he was likely to commit another crime. He was therefore entitled to be paroled on April 7, 2004, absent an affirmative adverse finding by the Commission.[28]  On April 6, 2004, prison officials at FCI Coleman, Florida—where Mr. Bowers was then incarcerated—began to process him for release. Exhibit 23.

30.    But then, on the day Mr. Bowers was to go home—with family and friends waiting outside the prison gates—the Commission halted his release. According to the Commission, since Mr. Bowers had waived a 2002 statutory interim hearing, he had somehow waived any consideration for mandatory parole. *See* Exhibit 24. Mr. Bowers filed an Emergency Petition for a Writ of Habeas

---

[28] *See* Exhibit 22 (Request for Parole Certificates dated Mar. 3, 2004 from Kevin J. Cimock, Case Manager). The Request for Parole Certificates indicated that Mr. Bowers' release plan had been approved by his Probation Office and that there had been no additional incident reports since Bowers' last parole hearing.

Corpus in the U.S. District Court for the Middle District of Florida (*Bowers v Holder*, Case No. 5:01-cv-429-Oc-10GRJ).

31.     In his Order Granting [the] Petition, Judge William Terrell Hodges rejected the Commission's waiver argument. *See* Exhibit 25 at 4-6.  However, he did not order Mr. Bowers' release since no finding had yet been made by the Commission under the mandatory parole statute. *See id.* at 6-7.  Instead, the Court ordered the Commission to review Mr. Bowers' file immediately to determine whether a mandatory parole hearing would be necessary and, if so, to hold any such hearing within sixty days. *See id.* at 7.

**E.     The December 2004 Mandatory Parole Hearing and Decision to Grant Parole**

32.     In response to the District Court's Order, the Commission initiated the process for a mandatory parole hearing.  Examiner Rob Haworth prepared a Prehearing Assessment.  He wrote that Mr. Bowers "consistently receives outstanding work evaluations from his job assignment," "appears to be a well respected inmate who gets along well with staff and other inmates," "has not had a disciplinary report since 1988," and "has not been a management problem for prison staff." Exhibit 26 at 2.  A mandatory parole hearing was scheduled for December 21, 2004.

- 19 -

33.     Prior to the hearing, Hans Selvog—who was the Clinical Director of

the National Center on Institutions and Alternatives—conducted a forensic

evaluation to assess Mr. Bowers' suitability for parole.[29] Mr. Selvog's report was

sent to the Commission on December 14. *See* Exhibit 27. He made the following

findings:

- Mr. Bowers' "overall profile does not indicate any significant generalized antisocial tendencies, nor does he show an underlying predisposition to break social rules," *id.* at 3;

- "he does not have a value system typical of that found in criminal populations," *id.*;

- "he is seen as not having significant authority conflicts; hence it appears he can relate to authority figures," *id* ;

- "he is generally experiencing well below average levels of anger; hence this emotion does not appear to be driving his behavior(s)," *id* ;

- "Mr. Bowers does not exhibit a criminal-lifestyle thinking pattern," *id* at 5; and

- "there is little evidence to suggest that he is at risk to recidivate in a violent manner." *Id.* at 6.

34.     Mr. Selvog also found there to be an "absence of risk factors that

would predict general recidivism" by Mr. Bowers. *Id.* He concluded:

---

[29] Mr. Selvog is a well-respected expert, whose evaluation was extensively relied upon by the Supreme Court in *Wiggins v  Smith*, 539 U.S. 510, 516, 528, 534, 536, 537 (2003) (finding based in part of Mr. Selvog's work that counsel's failure to hire forensic social worker to investigate defendant's difficult life for mitigation evidence rendered counsel's representation inadequate). A Commission analyst has acknowledged that Mr. Selvog "has impressive credentials." Exhibit 55 at 2.

> [P]sychological testing confirmed my clinical
> impressions of Mr. Bowers as someone who does not
> suffer from any psychiatric or personality disorders that
> would prohibit him from maintaining a normal, prosocial
> way of living and relating.  Nor does he harbor a corrupt
> or criminally oriented style of thinking or perceiving.
> Actuarial risk assessment provided additional support
> that Mr. Bowers, should be granted parole, would in all
> likelihood continue to engage in a lifestyle that is
> respectful of himself and others.

*Id.* at 10.  These findings, along with a glowing statement by Mr. Bowers' Case

Manager and much other positive evidence, were presented to Examiner Haworth

at the December 21 hearing.[30]  *See* Exhibit 28 at 2-3.

35.    In his Hearing Summary, Mr. Haworth noted that Mr. Bowers was

"entitled to his mandatory parole unless a determination is made that there is a

likelihood of future crime or that he has frequently or seriously violated the rules

of the institution," and that "no such finding can be made." *Id* at 3.    Specifically,

he determined that "[t]here are no case specific factors related to the offense that

would lead one to believe there is a likelihood of future crime" and "[b]ecause of

that, and with no prior criminal record, there does not seem to be a basis to believe

there might be future criminal behavior on the part of the subject." *Id.*  He also

found that Mr. Bowers' "performance in prison for the past 15 years has been

---

[30] This hearing was tape recorded and Mr. Bowers' representative specifically
requested that "anyone who reviews this case . . . listen to the tape of the hearing."
Exhibit 28 at 1.

outstanding," and that Mr. Bowers "has not been involved in any behavior that would cause one to believe he might commit future crime if released." *Id.* Thus, he found "no basis to deny mandatory parole." *Id.*

36.    Based on this evidence and his findings, Examiner Haworth recommended that Mr. Bowers be released on mandatory parole as of February 21, 2005. *See id.* at 3. A second hearing examiner concurred with this recommendation on January 6, 2005. *See* Exhibit 29. On January 13, Regional Commissioner Cranston Mitchell signed an Order agreeing with the two examiners. *See id.* Regional Commissioner Mitchell did not elect to designate the case as an original jurisdiction matter; his Order became the decision of the Commission under 28 C.F.R. §§ 2.23(d) and 2.24(a). Mr. Bowers was notified by a Notice of Action dated January 18 that he would be released on February 21. *See* Exhibits 30 & 31. Since February 21 was a holiday, Mr. Bowers was actually to be released on February 18, 2005.[31]

**F.    A Change In Plans**

37.    On or before February 16, an undisclosed person informed the Commission that Ranger Patrick's widow, Tomie Patrick Lee, had apparently not been notified of the December hearing. On February 16, a staff member advised

---

[31] *See* 28 C.F.R. § 2.29(c).

the Commission's General Counsel and Chief of Staff that Mrs. Lee had not been

notified, and recommended bringing the issue to Regional Commissioner

Mitchell's attention. *See* Exhibit 32.

38.    The next day, February 17, Mrs. Lee wrote to the Commission, saying

that she wished to provide additional information. *See* Exhibit 37.  That same day,

Commissioners Deborah Spagnoli and Patricia Cushwa, not Regional

Commissioner Mitchell, issued an Order reopening the case, retarding Mr. Bowers'

release, and ordering a special reconsideration hearing. *See* Exhibit 38.  The

Notice of Action reopening the case said that the Commission "has received

information from the registered victim(s) in your case that may impact the

Commission's decision to parole you." Exhibit 34.  The Notice did not explain

what that new information might be.  A special reconsideration hearing was set for

March 21, 2005.

39.    After the case was reopened, but before the hearing, the Commission

received letters from Mrs. Lee and a confidential source.   On March 18, just three

days before the hearing, the Commission issued a Supplemental Notice of Action,[32]

which stated:

---

[32] The language in this Supplemental Notice of Action was contained in a
document signed the previous day by Commissioners Spagnoli and Cushwa. *See*
Exhibit 38.

> The Commission has reopened your case to consider new
> adverse information, including two letters from the wife
> of the victim of your crime and one letter from a
> confidential source. The Commission . . . will reconsider
> its mandatory parole decision in light of the new
> information. On March 12, 2005, the Commission
> received a letter from the victim's wife in which she
> describes your attempt to contact her via the mail and
> your repeated denial of guilt and multiple claims . . . to
> be a political prisoner. On March 14, 2005, the
> Commission received a letter from a confidential source
> opposing your mandatory parole and asserting that your
> 1979 escape attempt and 1990 letter writing to the victim
> constitute serious institutional misconduct.

Exhibit 39. The Supplemental Notice of Action went on to state that at the

hearing, the Commission "will discuss the above matters with you. The

Commission will determine whether there is a probability you are likely to commit

another violent crime." *Id.* Further,

> [o]n the basis of the new information, as well as other
> information already in the Commission's possession, the
> Commission will specifically determine whether your
> political views were the impetus for your crime, and
> whether you continue to be motivated by the underlying
> reasons for your crime . . ." "the Commission will
> consider whether your 1979 escape attempt and 1990
> letter writing to the victim constitute serious institutional
> misconduct." *Id.*

40. The Commission refused to provide the letters to Mr. Bowers or his

counsel, but instead gave a brief summary of them in a letter to Mr. Bowers dated

arch 17. *See* Exhibit 37 at pp. 1-2. The Commission also provided Mr. Bowers on

March 17, four days before the Special Reconsideration Hearing, 47 pages of

documents. *See* Exhibit 37 at p. 3. On March 18, the Commission's Assistant

General Counsel, Douglas Thiessen, prepared a memorandum summarizing a radio

interview given by Mr. Bowers in 2002. *See* Exhibit 40. The memorandum states

that Mr. Bowers claimed in the interview that he was wrongly convicted for

political reasons, and thus was a political prisoner. The memorandum does not

suggest that Mr. Bowers expressed any bitterness or hatred, or any views

antithetical to the United States. *See id.* Mr. Thiessen did not place a recording or

transcript of the interview in the agency's record, but a transcript was published in

a local newspaper and we provide a copy as Exhibit 18.

**G.     The March 2005 Special Reconsideration Hearing And Related Referral
        To The Commission For Original Jurisdiction Consideration**

41.     The March 21 special reconsideration hearing was conducted by

Hearing Examiner Paul Howard. *See* Exhibit 41. Mr. Bowers was represented by

counsel and again spoke on his own behalf.[33]

42.     In his summary of the hearing, Examiner Howard noted that the

March 18 Supplemental Notice of Action "detail[ed] the specific matters that the

Commission would address at the hearing." *Id.* at 1. Mr. Bowers' representative

---

[33] Mr. Bowers' representative once again requested that "anyone who reviews the
case. . . listen to the tape of the hearing." *Id.* at 2.

explained that these issues had "already been addressed" by the Commission and were "not new information." *Id.* at 2. Examiner Howard agreed, finding that "the issues raised in the 2/17/05 and 3/18/05 NOAs, and 3/11/05 confidential source letter, are not new and significant information." *Id.* at 6. "These issues are old" and "the Commission has addressed them." *Id.*

43.   Mr. Howard reviewed the Commission's file, documenting Mr. Bowers' many achievements in prison and his suitability for release, and took additional evidence. Mr. Bowers spoke at length. He explained that although he has called himself a political prisoner due to his criminal prosecution, he does not hate society or the government. He is not bitter or interested in seeking revenge. *See id* at 4. Case Manager Victoria Oakes supported Mr. Bowers. He is a "stellar inmate who has always been respectful to staff" and she specifically noted that she "never observed him speaking negatively of the United States or others." *Id.* at 5. She also testified that he is a "model inmate and a role model to the younger inmates." *Id.* at 6. Thus, Ms. Oakes recommended that Mr. Bowers be paroled. *See id.*

44.   After reviewing the record and hearing Mr. Bowers and staff in person, Examiner Howard found that Mr. Bowers had been "a model prisoner" for many years and that there was "simply no basis to deny mandatory parole at this

time." *Id.* Mr. Bowers' assertion that he was prosecuted for political reasons is "not relevant to the subject's current mindset and behavior." *Id.* Examiner Howard recommended a parole date of May 7, 2005 and that the case be considered an original jurisdiction matter. *See id.*

45.     The case was next reviewed by another examiner, K. Pinner, who concurred with Examiner Howard's recommendation to parole Mr. Bowers and to consider it an original jurisdiction matter. A third examiner, Stephen Husk, agreed with Examiner Pinner. *See id.* at 7-8. Examiners Pinner and Husk both explicitly rejected any claim that Mr. Bowers posed a risk upon release due to his past political views. *See id.* at 7-8.

46.     On April 19, before Regional Commissioner Mitchell could vote on these recommendations, the case was designated as an original jurisdiction matter by Commissioner Spagnoli. *See* Exhibit 42. Mr. Bowers received a Notice of Action dated April 20 that his case was being referred to the full Commission. *See* Exhibit 44. Two weeks later, on May 6, Regional Commissioner Mitchell—who was the only person authorized to designate the case an original jurisdiction matter under 28 C.F.R. § 2.17—signed an after-the-fact Order designating the case as such. *See* Exhibit 46.

- 27 -

47.    No formal hearing was held in connection with the Commission's original jurisdiction review of this case. Rather, each Commissioner voted sequentially per the agency's practice. *See* 28 C.F.R. § 2.17(a); USPC Manual, § 2.17-04. Both Commissioners Spagnoli and Cushwa voted to deny mandatory parole,[34] and Commissioner Spagnoli wrote a memorandum explaining her views. *See* Exhibit 43. On May 5 and 9, Regional Commissioner Mitchell and Chairman Edward Reilly, respectively, signed an Order agreeing with the examiner panel's recommendation to grant mandatory parole effective June 21. *See* Exhibit 47. On May 12, Commissioner Fulwood recused himself. *See* Exhibit 48. That left the Commission split 2-2-1.

48.    Due to this split vote, Chairman Reilly requested a written opinion from the agency's General Counsel, who advised that "the Commission must grant [Mr.] Bowers mandatory parole." Exhibit 49 at 1. He concluded: "[T]he Commission has had the opportunity to exercise its discretionary judgment based on an expanded administrative record and has not found, by the required majority vote, that one of the permissible reasons for denying mandatory parole exists." *Id.* at 2 (footnote omitted). Thus, "the statute compels mandatory parole." *Id.*

---

[34] *See* Exhibit 45 (4/20/05 Order [form]). This Order form recorded the votes of these two Commissioners. Because their votes did not constitute a majority, this "Order" never became effective.

49.    After reviewing this opinion, Regional Commissioner Mitchell and Chairman Reilly signed another Order on May 13, granting Mr. Bowers a mandatory parole date of June 21. *See* Exhibit 50.  A Notice of Action of Action was issued on May 17, stating:  "After full consideration of all relevant factors, the Commission has not made a finding that one of the permissible reasons for denying mandatory parole exists in your case.  Therefore, in the absence of such a finding, 18 U.S.C. 4206(d) requires your release on parole."  Exhibit 51.

## H.    Commissioner Spagnoli's Secret Mission

50.    On June 1, disappointed with the Commission's decision, Commissioner Spagnoli covertly sent the Attorney General's office a fourteen-page memorandum, *see* Exhibit 53, which one might reasonably call a polemic against Mr. Bowers.  She purported to explain the "[i]ssues relating to whether or not the Attorney General should appeal the Parole Commission's Decision to grant mandatory parole to Veronza Bowers." *Id*. at 1.  At the outset, she noted that "the Fraternal Order of Police sent a letter to the Attorney General registering their 'vehement opposition to the decision of the U.S. Parole Commission to release Veronza L. Bowers, Jr.' and to request that the Attorney General direct the National Appeals Board to review the case." *Id*. at 3.  Commissioner Spagnoli reminded the Attorney General that "[t]he Fraternal Order of Police is the largest

- 29 -

law enforcement labor organization in the United States with more than 318,000

members." *Id.* at 2, fn 6.  Commissioner Spagnoli then gave the Attorney General

her views as to the "relevant facts, possible procedural or legal errors and potential

appeal issues in this case." *Id.* at 3.  As she acknowledged, her reasons for denying

mandatory parole to Mr. Bowers were "apparent" throughout this presentation. *Id.*

In that same Memorandum, Commissioner Spagnoli also noted that she would

participate in any further proceedings in this matter. *See id.*

51.     After laying the blueprint for an appeal, Commissioner Spagnoli

concluded with the following statement:

> I do not see a downside to an Appeal by the Attorney
> General.  By requesting that the Commission review its
> decision, the AG gets credit for so doing with crime
> victims and law enforcement. . . If the Commission
> decides to affirm its release decision, the Attorney
> General did everything he could to prevent that from
> happening . . . If the Commission decides to reverse its
> decision and deny parole to this defendant, then the
> Attorney General gets credit for protecting the public
> from a dangerous criminal.

*Id.* at 14.

52.     Neither Mr. Bowers nor his counsel had any idea that Commissioner

Spagnoli had engaged in this clandestine communication.  The very fact that she

had sought out the Attorney General's intervention—much less the document

itself—was not disclosed during the ensuing proceedings.  Commissioner Spagnoli

did not place a copy in the Commission's file, even after Chairman Reilly wrote to all of the Commissioners in August 2005, asking them to make sure that a copy of all correspondence in the case was placed in Mr. Bowers' file. Exhibits 62.

53.     On September 7, 2007—over two years after Commissioner Spagnoli sent her Memorandum—Chairman Reilly wrote Mr. Bowers, saying that he had only "recently learned" about Commissioner Spagnoli's secret memorandum. Exhibit 79 at 1. The Chairman acknowledged that the memorandum "outlined arguments that could be used by the Attorney General to file an appeal" and that it "create[d] an appearance that former Commissioner Spagnoli may not have exercised impartial judgment in voting on the Attorney General's appeal." *Id.* He enclosed the heavily-redacted copy of the memorandum that is submitted with this petition as Exhibit 53. *See id.* The complete document has never been shown to Mr. Bowers or his counsel.

## I.     Enter The Attorney General

54.     On June 9, eight days after Commissioner Spagnoli sent her surreptitious communication, Attorney General Gonzales personally intervened. He submitted a one paragraph document to the Commission, which he titled a "Memorandum for the U.S. Parole Commission." *See* Exhibit 54. It states in full:

> Pursuant to the Rules and Regulations of the United
> States Parole Commission and in response to the May 17,

- 31 -

> 2005 Notice of Action, I request that the Commission
> review and consider the Veronza L. Bowers matter and
> render a new decision on whether to grant or deny parole
> to Bowers. Because the original jurisdiction decision
> was split 2-2-1, reconsideration may clarify the Parole
> Commission's decision in this matter. Further review
> will give each of the five Commissioners the opportunity
> to clarify their positions on whether to grant or deny
> parole to Bowers. Finally, the review may address any
> factual/or legal ambiguities contained in the initial
> decision.

*Id.* The call for "[f]urther review" to give the Commissioners "the opportunity to

clarify their positions" follows the suggestion in Commissioner Spagnoli's

memorandum that the Attorney General "ask the Commission to review the case

and make its determination with great specificity." *See* Exhibit 53 at 14.

## J.    The Commission Responds

55.    Treating the Attorney General's request as a "petition for

reconsideration," the Commission issued a Notice of Action on June 14—a week

before Mr. Bowers was scheduled to be released. This Notice of Action reopened

the case and retarded Mr. Bowers' parole date of June 21 "for up to 60 days to

consider [the] petition of the Attorney General for reconsideration of original

jurisdiction decision." *See* Exhibit 56; *see also* Exhibit 57.

56.    Having never before received such an extraordinary request from any

Attorney General, the Commission had no rules for handling it. The Commission

- 32 -

scheduled a closed-door meeting to consider how it should proceed on the

Attorney General's petition.  Commission staff communicated with the Attorney

General's Office in advance and gave the Department of Justice a draft set of rules

and procedures for deciding the Attorney General's petition.  *See* Exhibit 59.  The

Attorney General's office provided comments as to how its own appeal should be

handled.  *See* Exhibit 60.  Neither Mr. Bowers nor his counsel was provided an

opportunity to comment on the draft rules and procedures.

57.  On August 2, at a meeting closed to the public, the Commission

adopted what it titled "Procedures for Reviewing Attorney General's Request for

Review of the Case of Veronza Bowers."  Exhibit 61.  No notice of that meeting

was published in the Federal Register, as required under the Government in the

Sunshine Act, nor were the proposed procedures or the final procedures ever

published in the Federal Register, notwithstanding a suggestion from the

Department of Justice that the Administrative Procedure Act might require such

notice and publication.  *See* Exhibit 60 at 1.

58.  On August 8, Commissioner Spagnoli sent her fellow Commissioners

a memorandum, pointing out that the Commission "had not noticed the meeting as

required by law."  Exhibit 63 at 1.  She thus suggested that the Commissioners re-

vote on the rules, "and that way, we cover ourselves legally with regard to the

unnoticed closed meeting and any action discussed and acted upon." *Id.* at 2. Mr. Bowers has no documents reflecting whether the Commission followed her advice. Mr. Bowers and his attorney, along with other interested parties,[35] were simply advised of the procedures adopted by the Commission in a letter dated August 9. *See* Exhibit 64.

59.     Under the ad hoc procedures, the Attorney General, Mrs. Lee, and any other interested party had 20 days to submit written comments. *See* Exhibit 61. Mr. Bowers had 20 days to file his response and the Commission would then consider the matter at its October meeting. *See id.* However, if the Commission received any "new and significant information not previously disclosed to Mr. Bowers," it was required to "remand the case for a hearing." *Id.*[36]

60.     The Attorney General filed comments on September 1. *See* Exhibit 67. On September 21, Mr. Bowers filed a timely response. *See* Exhibit 68. Although the ad hoc procedures did not authorize any such filing, the Attorney General submitted a reply to the Commission on September 30. *See* Exhibit 70. In this reply, the Attorney General's Office also requested the opportunity to appear

---

[35] The notification also went to seven law enforcement organizations, two identified individuals, two individuals whom the Commission would not identify, and Mrs. Lee. *See* Exhibit 64.

[36] No new or significant information was later introduced and no further hearings were held.

before the Commission during its closed meeting, though that too was not allowed

under the ad hoc procedures. *See id.* at 4. On October 3, Mr. Bowers objected to

this unauthorized filing and the Attorney General's presence at the meeting. *See*

Exhibit 71 at 1. He also filed a substantive response to the Attorney General's

reply. *See* Exhibit 72. Assistant General Counsel Thiessen prepared an appeal

summary for the Commission dated September 23, 2005, in which he argued that

mandatory parole should be denied. *See* Exhibit 69.

## K.    The Commission Changes Position

61.    The Commission met on October 6 in closed session.[37]  See Exhibit

74. The case was presented by Mr. Thiessen, who began with the following

statement:

> I would probably be the person who would know the
> facts of this case better than anybody because I defended
> it several times in federal court and *have been working
> closely with the Attorney General's Office back and forth
> regarding this review.*

*Id.* at 2 (emphasis added).

62.    Mr. Thiessen focused on why, in his view, Mr. Bowers should be

denied mandatory parole. He discussed the underlying crime at length, *see id.* at 3-

5 & 11-12, the 1979 escape attempt, *see id* at 6-7, Mr. Bowers' alleged "hatred"

---

[37] Since Commissioner Fulwood recused himself once again, the Commission only
consisted of the same four Commissioners who had decided the matter previously
in May. *See* Exhibit 74 at 1.

- 35 -

for law enforcement and the government, *see id* at 7, a website maintained by supporters of Mr. Bowers, and his claim to be a "political prisoner." *See id.* at 8. Mr. Thiessen stated that "as recently as 2002 [Mr. Bowers] gave a radio interview, in which he again showed his contempt to the United States Government," *id.* at 7, and that "he hasn't changed his viewpoint of animus towards the United States Government, its employees, and the justice system." *Id.* at 8. Mr. Thiessen also emphasized the fears expressed by Ms. Lee, which were unsupported by anything other than the misunderstanding about the 1990 letter. *See id* at 8-9.[38]

63.     Mr. Thiessen did not mention the Commission's 1995 findings with respect to the letter to Mrs. Lee, Mr. Bowers' efforts to improve himself while in prison, his outstanding institutional adjustment, any of the laudatory comments made about Mr. Bowers by prison officials who supported his release over the years, the detailed findings made by the five independent hearing examiners, or the positive details of Mr. Selvog's psychological evaluation. *See* Exhibit 74.

64.     Since Mr. Bowers was not present at this meeting, the Commission had no basis to assess his credibility in person, nor did the Commission listen to the recordings of the December 2004 and March 2005 parole hearings, as Mr. Bowers' representative had urged. They did not discuss—much less defer to—the

---

[38] Mr. Thiessen may have made other arguments; however, the transcript of the hearing provided to Mr. Bowers has been heavily redacted. *See* Exhibit 74.

credibility-based findings of the hearing examiners who met Mr. Bowers, who
found that his claim to be a political prisoner did not reflect any ongoing hatred of
the United States, and who found that he was an excellent candidate for parole.
*See Id.*

65.     The transcript of the meeting shows that the Commission first decided
to deny mandatory parole and only then sought reasons to support its decision.
Commissioner Spagnoli began by noting that she had been trying to think through
"how should we do this" and suggested a review of the alleged facts supporting her
proposed findings.  Exhibit 74 at 12-13.  Another Commissioner stated:

> Well personally I don't see a need to do all that if we can
> agree on what our decision would be . . . If we all just
> come out and say what we, why are we going, if we just
> say what we are going to do here, and then decide on
> what the ultimate decision is going to be and then we
> fashion our reasons.

*Id.* at 14.  The Commissioners then turned to reasons to deny parole, including an
extensive discussion of whether Mr. Bowers' 1990 letter to Mrs. Lee was a serious
infraction of institutional rules, *see id.* at 12-21, even though the Bureau of Prisons
had already decided that it was not and the Commission had previously agreed.[39]

---

[39] Mr. Thiessen cautioned against using the letter as a basis for denial of parole
since Mr. Bowers "did not receive an institutional infraction" for it.  He also
suggested that using the letter against Mr. Bowers might violate his due process
rights—especially since the Commission did not even have a copy of it—and that

Commissioner Spagnoli replied that she did not "care that it was or wasn't investigated" since she was using her "independent judgment....," *id.* at 19. And, there was no discussion during the meeting of the factual findings made by Examiner Robertson in 1995, who found that the letter was not threatening or intimidating in any manner. *See* Exhibit 74; *see also* Exhibit 10 at 3.

66.     Ultimately, all four Commissioners agreed that the escape attempt was "serious institutional misconduct," while Commissioners Reilly, Cushwa, and Spagnoli also found that there was "a reasonable probability that [Mr.] Bowers will commit another crime." *Id.* at 25 & 32. Commissioners Cushwa and Spagnoli further found the letter to be a "serious" violation of institutional rules. *Id.* at 32-33; *see also* Exhibit 75. The following day, the Commission issued a Notice of Action on Appeal, denying mandatory parole. *See* Exhibit 76.

67.     On October 12, 2005, the National President of the Fraternal Order of Police, Chuck Canterbury, wrote to Attorney General Alberto Gonzales "[o]n behalf of the more than 321,000 members" of the group. Exhibit 77. Mr. Canterbury thanked the Attorney General for assistance "in blocking the release" of Mr. Bowers, and invited the Attorney General to contact him if he could "be of any further service." *Id.*

---

"given the fact that the Attorney General got involved, it could look as if the Commission was being [inaudible]." *Id.* at 16-18.

## FIRST CLAIM FOR RELIEF
(Fifth Amendment to the United States Constitution)

68.     Mr. Bowers realleges and incorporates into this claim of relief the allegations made in paragraphs 1-67 of this Petition, as well as those facts, allegations and arguments contained in the accompanying Memorandum of Law and supporting Exhibits.

69.     The Commission violated the Due Process Clause of the Fifth Amendment to the United States Constitution by twice reopening Mr. Bowers' case, failing to release him on parole as twice scheduled, failing to act as a neutral, unbiased decision-maker, making arbitrary and result-oriented decisions, and then denying him release on mandatory parole.  Mr. Bowers is therefore in custody in violation of the Constitution or laws of the United States within the meaning of 28 U.S.C. § 2241(c)(3).

## SECOND CLAIM FOR RELIEF
(Parole Commission and Reorganization Act, 18 U.S.C. §§ 4201, *et seq.*)

70.     Mr. Bowers realleges and incorporates into this claim for relief the allegations made in paragraphs 1-67 of this Petition, as well as those facts, allegations and arguments contained in the accompanying Memorandum of Law and supporting Exhibits.

71.    The Commission violated the Parole Commission and Reorganization Act, 18 U.S.C. §§ 4201, et. seq., by twice reopening Mr. Bowers' case, failing to release him on parole as twice scheduled, failing to act as a neutral, unbiased decision-maker, making arbitrary and result-oriented decisions, and then denying him release on mandatory parole.  Mr. Bowers is therefore in custody in violation of the Constitution or laws of the United States within the meaning of 28 U.S.C. § 2241(c)(3).

### THIRD CLAIM FOR RELIEF
(Parole Commission's Rules and Regulations, 28 C.F.R. §§ 2.1, *et seq*.)

72.    Mr. Bowers realleges and incorporates into this claim for relief the allegations made in paragraphs 1-67 of this Petition, as well as those facts, allegations and arguments contained in the accompanying Memorandum of Law and supporting Exhibits.

73.    The Commission violated its governing rules and regulations, 28 C.F.R. §§ 2.1, *et seq*., by twice reopening Mr. Bowers' case, failing to release him on parole as twice scheduled, failing to act as a neutral, unbiased decision-maker, making arbitrary and result-oriented decisions, and then denying him release on mandatory parole.  Mr. Bowers is therefore in custody in violation of the Constitution or laws of the United States within the meaning of 28 U.S.C. § 2241(c)(3).

## FOURTH CLAIM FOR RELIEF
(Previous Court Order)

74.    Mr. Bowers realleges and incorporates into this claim for relief the allegations made in paragraphs 1-67 of this Petition, as well as those facts, allegations and arguments contained in the accompanying Memorandum of Law and Exhibits.

75.    The Commission violated the terms of the Order entered on October 26, 2004 in *Bowers v Holder*, No. 5:04-cv-208-OcGRJ (M.D. Fla.) by twice reopening Mr. Bowers' case, failing to release him on parole as twice scheduled, and then denying him release on mandatory parole.  Mr. Bowers is therefore in custody in violation of the Constitution or laws of the United States within the meaning of 28 U.S.C. Section 2241(c)(3).

## PRAYER FOR RELIEF

WHEREFORE, PETITIONER RESPECTFULLY REQUESTS THAT THIS COURT:

1.    Grant his Petition for a Writ of Habeas Corpus and order him released on parole;

2.    Award reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 3006A, 28 U.S.C. § 2412, Federal Rule of Civil Procedure 54, and any other applicable provisions;

3.   Grant such other relief as law and justice require.

Dated:  June 24th, 2008

Respectfully submitted,

*Pro hac vice* applications to be
submitted for:

A. Stephens Clay
(Georgia Bar No. 129400)
C. Allen Garrett, Jr.
(Georgia Bar No. 286335)
KILPATRICK STOCKTON LLP
1100 Peachtree Street; Suite 2800
Atlanta, Georgia 30309
Telephone: (404) 815-6500
Facsimile: (404) 815-6555
E-mail: sclay@kilpatrickstockton.com
E-mail:
agarrett@kilpatrickstockton.com

Bryan Gaynor
(California SBN 47875)
1160 G Street, Suite A
Arcata, California 95521
Telephone:  (707) 826-8544
Facsimile:  (707) 826-8545
Email:  bwgaynor@humboldt1.com

Thomas W. Stoever, Jr.
Arnold & Porter LLP
(Colorado Bar No. 25434)
370 Seventeenth Street
Suite 4500
Denver, CO 80202
Telephone:  303-863-2328
Facsimile·   303-832-0428
E-mail:  thomas.stoever@aporter.com

Charles Weisselberg
(California SBN 105015)
University of California, Berkeley
School of Law
Berkeley, CA  94720-7200
Telephone:  (510) 643-8159
Facsimile:  (510) 642-3856
Email:cweisselberg@law.berkeley.edu

Theodore D. Frank
Arnold & Porter LLP
(D.C. Bar No. 23903)
555 12th Street, N.W.
Washington, D.C. 20004
Telephone:  202-942-5790
Facsimile:   202-942-5999
Email:  theodore.frank@aporter.com

*Attorneys for Petitioner VERONZA L. BOWERS, JR.*

- 42 -

## VERIFICATION

I, Theodore Frank, declare that I am one of the attorneys for Petitioner, Veronza L. Bowers, Jr , and am making this verification on his behalf. To the best of my knowledge, all of the facts set forth in the attached Petition for a Writ of Habeas Corpus are true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 23rd day of June, 2008 at Washington, D.C.

Theodore Frank